UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

ALEXIS DEVON SMITH,

                    Petitioner,                    Case No. 1:05-cv-548

v.                                                 Honorable Janet T. Neff

BLAINE LAFLER,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a term of life imprisonment without the possibility of parole and a consecutive two-year term of imprisonment, imposed by the Ingham County Circuit Court on September 20, 2000, after a jury convicted Petitioner of first-degree felony murder, MICH. COMP. LAWS § 750.84; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  In his amended petition (docket #5), which was filed by counsel, Petitioner raises seven grounds for relief, as follows:

I.      Defendant was deprived of his Fifth and Fourteenth Amendment rights of due process and his Sixth Amendment right to effective assistance of counsel when counsel failed to object to erroneous jury instructions.

II.     The trial court erred by not fully charging that aiding and abetting required an intent to kill.

III.    The trial court erred by shifting the presumption of innocence.

IV.     The trial court erred by failing to instruct the jury that their verdict must be unanimous with regard to each offense.

V.      The trial court erred by not permitting the jury to consider abandonment.

VI.     Petitioner's counsel was ineffective for failing to file a motion for a new trial.

VII.    Petitioner was deprived of his Fifth and Fourteenth Amendment due process rights as a result of the cumulative effect of the above errors.

Respondent has filed an answer to the petition (docket #15) stating that the grounds should be denied because they are without merit or are procedurally defaulted.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the shooting death of Denise McCall on January 20, 1998, in Lansing, Michigan.  Petitioner and a co-defendant, Averill Williams,[1] were tried together before a jury on July 24-31, 2000.

Arthur Austin testified that on January 20, 1998, he lived at 2111 Hampton Drive in the City of Lansing.  (Tr. II, 20.)[2]  Austin lived with McCall, his girlfriend of eight years, and her son, Vincent Burns.  (Tr. II, 22-23.)  At that time, both Austin and McCall worked for General Motors.  (*Id.*)  Burns, who was twenty-one years old in January 1998, lived in the basement.  (Tr. II, 23.)  On January 20, 1998, Austin and McCall went to the hospital after work because Burns

---

[1]Averill Williams' first name is misspelled throughout the trial transcripts as "Averell."

[2]The trial transcripts will be referred to as follows:
Tr. I    Trial Transcript Vol. I,  July 24, 2000 (docket #22)
Tr. II   Trial Transcript Vol. II, July 25, 2000 (docket #23)
Tr. III  Trial Transcript Vol. III, July 27, 2000 (docket #24)
Tr. IV   Trial Transcript Vol. IV, July 28, 2000 (docket #25)
Tr. V    Trial Transcript Vol. V, July 31, 2000 (docket #26).

suffered injuries, including a broken leg, in a fight with two men.  (Tr. II, 25.)  After they took Burns

home from the hospital, Austin and McCall went to pick-up some food and McCall's six-year-old

granddaughter, Contoya Calhoun, because she was going to spend the night with them.  (Tr. II, 25-

26.)

        Austin testified that later that evening, the dog starting barking and then he heard a

knock at the door.  (Tr. II, 29, 54.)  At that time, Contoya was in her room and McCall was in the

shower.  When Austin opened the door, he saw a young lady standing out in the driveway.  (Tr. II,

29-30.)  She asked if Vincent was home.  (Tr. II, 30.)  Austin knew that Vincent Burns was home,

but went to check with him because he did not recognize the girl.  (Tr. II, 31.)  Austin went to the

top of the basement stairs and yelled to Burns that someone wanted to see him.  (*Id*.)  Burns asked

who the visitor was.  (*Id*.)  Austin went back to the front door and asked the girl for her name.  (Tr.

II, 32.)  She replied "Angie" or "Angela."  (*Id*.)  Austin went back to the stairs and told Burns her

name.  Burns did not recognize the name and did not come up from the basement.  (*Id*.)  Austin went

back to the front and told the girl that Burns did not know her.   The girl responded, "just tell him

to come out."  (*Id*.)  Austin walked toward the basement stairs for the third time to tell Burns what

the girl said.  (Tr. II, 33-34.)

        As Austin was going back toward the front door, two or three men barged through

the front door.  (Tr. II, 34.)  The men were wearing ski masks with only their eyes exposed.  (Tr. II,

78.)  Austin did not see the men before they came through the door and had not given them

permission to enter the house.  (Tr. II, 35-36, 47.)  One of the men immediately turned Austin

around and put a gun to his head.  (Tr. II, 35-36.)  The man guided him through the kitchen and into

the TV room.  (Tr. II, 36-37.)  The man then pushed down on Austin's shoulder and ordered him to

lay face-down on the floor.  (Tr. II, 36-37, 71.)  The man continued to hold the gun to Austin's head

and ordered him to call Burns up from the basement.  (Tr. II, 38.)  Austin yelled for Burns, but Burns

kept asking who it was and did not come up from the basement.  (Tr. II, 39, 47, 73.)  The intruders

never attempted to communicate with Burns directly.  (Tr. II, 74.)

At some point, Austin could hear McCall asking what they wanted and pleading with

the intruders not to hurt them.  (Tr. II, 41-42.)  At the same time, Austin could hear a person cursing

at McCall and telling her to "get down" and "shut up."  (Tr. II, 41, 75.)  The person talking to

McCall was not the same person holding the gun to Austin's head.  (Tr. II, 72.)  In the midst of the

pleading and cursing, he heard three or four gun shots.  (Tr. II, 42.)  After the shots, Austin could

hear the intruders running away.  (Tr. II, 42-43.)  Austin grabbed the phone and went to McCall,

who was laying face-down on the kitchen floor.  (Tr. II, 43, 46.)  As he dialed 911, Austin headed

toward Contoya's bedroom.  (Tr. II, 43.)  He met Contoya in the hallway going back to the

bedrooms and took her back to her bedroom.  (*Id.*)

Austin was certain that at least two men came into the house and was fairly certain

that he saw a third person as he was being turned around.  (Tr. II, 50, 66.)  He believed there were

two people by him while he was on the floor and a third person was with McCall in the kitchen.  (Tr.

II, 80, 83.) Austin could not identify the intruders and was not certain whether the third person was

a man or a women.  (Tr. II, 52.)

Lansing Police Officer Quincy Scroggins testified that he was dispatched to 2111

Hampton Drive at 9:29 p.m. on a report of shoots fired.  (Tr. II, 85.)  When he was about a block-

and-a-half away from the address, he saw a black male running across the street wearing blue and

white hospital scrubs.  (Tr. II, 87.)  The man, later identified as Vincent Burns, flagged the officer

down at the intersection and ran toward his car.  (Tr. II, 87, 89.)  Burns was very upset and had

bandages on his arm and ankle.  (Tr. II, 87.)  Scroggins patted Burns down as a safety precaution

and then put him in the police car.  (Tr. II, 87.)  Burns told Scroggins that he lived at 2111 Hampton.  (Tr. II, 88.)  He said that his stepfather had called him upstairs, but he was reluctant to go upstairs and decided to crawl out of a basement window.  (*Id.*)  Burns also told the officer that as he ran from the house, he heard his mother screaming and about six gunshots coming from within the house.  (Tr. II, 89.)

        Lansing Police Officer Gary Masseau, Jr., testified that he was the first police officer to arrive at 2111 Hampton Drive following the shooting.  (Tr. II, 94.)  Austin let the officer into the house and took him to the kitchen where McCall was laying face down in a pool of blood.  (*Id.*)  Masseau believed that McCall was still breathing and called for medical assistance.  (Tr. II, 95.)  Masseau and other officers who had arrived on the scene searched the house to make sure that none of the intruders remained in the house.  (Tr. II, 96.)  They found a little girl in one of the bedrooms.  (*Id.*)  Masseau searched the basement, but did not find anyone.  (*Id.*)  He observed that one of the basement windows had been broken or pulled out.  (*Id.*)

        Lansing Police Officers Laurie Baukus and DeYoung were the evidence technicians assigned to the crime scene.  (Tr. II, 107.)  Baukus testified that they observed bullet holes, bullet casings and slugs in the kitchen.  (Tr. II, 114-15.)  Baukus collected approximately seven bullet casings and nine slugs for ballistics testing.  (Tr. II, 122-23, 145.)  In the basement, Baukus observed a broken window with a chair underneath it.  (Tr. II, 117.)  There was a pager on the bed in the basement and the officers discovered a 9-millimeter Luger handgun, a knife with a sixteen-inch blade and a Wells Fargo bank bag between the mattress and the box spring.  (Tr. II, 117-18, 130.)  The bank bag contained $1,100.00 in one-hundred dollar bills.  (Tr. II, 130.)  At a later date, Baukus

photographed and made casts of some footprints that were under the bushes on the north side of the house.  (Tr. II, 134-35.)

Dr. Lawrence Simson, Jr., a forensic pathologist, conducted the autopsy on the victim.  (Tr. II, 153.)  Simson testified that the victim suffered five gunshot wounds.  (Tr. II, 154.) One bullet entered the left side of the head, tracked at a sharp downward angle and lodged in the soft tissues of her back.  (Tr. II, 157-58.)  A second bullet grazed the left side of the victim's face, entered the side of her neck and exited from the back of her neck.  (Tr. II, 159.)  Based on the gun powder residue around the entry wound, Dr. Simpson estimated that the shot was fired from about a foot away.  (Tr. II, 160-61.)  A third bullet entered her back below the right shoulder blade, moved laterally from left to right for several inches before it exited the body.  (Tr. II, 162-63.)  A fourth bullet entered in the area of her right breast, traveled at a sharp downward angle across the front of her chest and exited her body.  (Tr. II, 164.)  The fifth shot entered in the area of her left breast, passed through the chest from left to right, striking the heart, diaphragm and liver.  (Tr. II, 166.) While the other four shots were not individually fatal, the fifth shot was inevitably fatal.  (Tr. II. 159, 162-166.)  The fifth shot stopped her instantly and death followed in a matter of seconds.  (Tr. II, 167.)  Simson testified that the victim was not clothed when she was shot.  (Tr. II, 168.)

Gregory Michaul, a latent finger print examiner with the Michigan State Police Crime Laboratory in East Lansing, testified that he examined seven Smith and Wesson 40-caliber shell casings in connection with this case.  (Tr. III, 12.)  He did not detect any latent finger prints on the shall casings.  (Tr. III, 14.)  Another Michigan State Police Crime Lab employee, Scott Marier, testified as an expert in firearm identification.  (Tr. III, 22.)  Marier concluded that the seven 40-

caliber Smith and Wesson shell casings were fired from the same gun.  (Tr. III, 40-41.)  He believed

that the bullets were fired from a Glock pistol.  (Tr. III, 41.)

Willy Peters, Jr., was twenty-four years old at the time of trial.  (Tr. III, 52.)  Peters

testified that he went to Vincent Burns' house in January 1998, with Averill Williams and "Capone."

(Tr. III, 53-54.)  Peters had heard of Vincent Burns, but did not know him personally.  (Tr. III, 112.)

Peters had known Williams for eighteen years, but did not know Capone before that night.  (Tr. III,

54-55.)  Peters identified Petitioner as Capone.  (Tr. III, 55.)  Peters testified that Williams called

him and asked if he wanted to go with him to steal some money from Burns.  (Tr. III, 55-56.)

Williams told Peters that Burns had gotten about $12,000 from breaking in to people's houses.  (Tr.

III, 56, 120.)  Williams told Peters that he would give him some of the money after they robbed

Burns.  (Tr. III, 120.)  Peters drove himself and his cousin, Albert Evans, in a rental car to meet

Williams at Terranova's, a liquor store on the south side.  (Tr. III, 57.)  Williams and Petitioner got

into the car with Peters and Evans.  (Tr. III, 58-59.)  Williams told Peters that they were going to

Burns' house to take back some money and that he needed Peters to "look out for him."  (Tr. III, 59.)

Peters did not know where Burns lived, but Williams gave him directions.  (Tr. III, 60.)  As they

drove, Williams discussed the plan for robbing Burns.  (Tr. III, 59-60.)  At trial, Peters testified that

Petitioner was not really talking much at that point, but made little statement like "we can do it."

(Tr. III, 61, 92.)  Peters admitted to testifying at the preliminary examination that during the drive

to Burns' house, Petitioner "was just quiet the whole time."  (Tr. III, 92.)

Peters parked on the street near Burns' house.  (Tr. III, 61.)  Williams discussed that

he did not want them to be seen, and he wished that they had a girl to knock on the door.  (Tr. III,

62.)  Peters suggested Victoria Beasley, who was like a sister to him.  (Tr. III, 62-63.)  Peters called

Beasley on his cell phone and then drove to her house, which was about five minutes away.  (Tr. III, 64.)  Peters told Beasley that he wanted her to knock on the door for him but did not tell her their purpose.  (Tr. III, 65.)  Beasley agreed and got in the car with them.  (Tr. III, 65.)  Peters drove back to Burns' house and parked just down the street from his house.  (Tr. III, 66.)  Williams told Beasley to knock on the door, ask for Vincent and then walk away.  (*Id.*)  After Beasley knocked on the door, Peters, Williams and Petitioner got out of the car and hid in locations near the front door.  (Tr. III, 67-68.)  Peters hid on the side of the truck in the driveway, while Williams and Petitioner hid in the bushes next to the door.  (Tr. III, 68.)  Peters testified that all three of them were armed - Peters had a .380 handgun, Williams had a 40 Glock handgun and Petitioner had a 9-millimeter handgun.  (Tr. III, 68-69.)  Peters and Williams were wearing ski masks to conceal their faces.  (Tr. III, 70-71, 93.)  Petitioner pulled the hood on his coat tight, so only his eyes were exposed.  (Tr. III, 93-94, 146.)

Peters testified that when the man who answered the door left to get Burns, Williams told Beasley to go back to the car.  (Tr. III, 73.)  After that, Williams went in the house through the front door, followed by Petitioner and then Peters.  (Tr. III, 74.)  When Peters entered the house, he saw the man laying face down on the floor.  Williams and Petitioner were standing over him with their guns to his head, telling him to get Burns.  (Tr. III, 74, 140.)  Burns responded by asking "who is it" a few times, but did not come up from the basement.  (Tr. III, 76, 131.)  Williams started walking toward the basement when he and Petitioner indicated that they heard a sound coming from the basement and realized that Burns was escaping from the house.  (Tr. III, 77.)  Williams told Petitioner to go after Burns, so Petitioner ran out of the house and Peters followed.  (Tr. III, 78.)  Just before Peters left the house, he saw a woman peeking around the corner.  (Tr. III, 78, 104.)  Peters motioned at her to come out into the kitchen because he did not want her calling the police.

- 8 -

(*Id.*) The woman, who was naked, complied with Peters' order.  (Tr. III 138.)  As he was leaving, Peters told Williams to "come on," but Williams said "no" and "somebody got to go."  (Tr. III, 80.) At the time, Peters did not realize that Williams was going to shoot someone.  (Tr. III, 105-06.) When Peters reached the driveway, he heard three or four gunshots coming from the house.  (Tr. III, 81, 106.)  Peters and Petitioner got into the car with Beasley and Evans.  (Tr. III, 81, 134.)  Evans had remained in the car the entire time but had moved into the driver's seat.  (Tr. III, 81, 107.) Williams got into the car a couple of minutes later.  (Tr. III, 82.)

Peters testified that they drove Beasley back to her house.  (Tr. III, 83.)  Before Beasley got out of the car, she demanded that Peters, Williams and Petitioner give her their guns. (Tr. III, 83-84.)  Beasley put the guns in a duffel bag and took them into her house.  (Tr. III, 84.) About four days later, Peters went to Beasley's house and got the guns back.  (Tr. III, 84.)  Peters gave Williams' and Petitioner's guns to Williams.  (Tr. III, 84-85.)  Peters testified that they had not planned to shoot anyone at Burns' house.  (Tr. III, 110.)  When Peters asked Williams why he shot the woman, he responded, "Fuck that Bitch, she had to go."  (Tr. III, 85.)

At the time of the trial, Peters was serving a prison sentence for manslaughter in connection with the shooting death of Vincent Burns in June of 1998.  (Tr. III, 53.)  Peters testified that Burns followed him and opened fire on him at a gas station because of Peters' involvement in Burns' mother's death.  (Tr. III, 53, 112, 116.)  Peters shot back, killing Burns.  (*Id.*)  After Peters was sentenced in that case, a detective came to talk to him in prison about the murder of Denise McCall.  (Tr. III, 87.)  In exchange for his truthful testimony in this case, Peters was allowed to plead guilty to second-degree murder and was sentenced to imprisonment of twenty-two to fifty years.  (Tr. III, 87-88.)

Victoria Beasley was thirty-two years old at the time of trial.  (Tr. III, 150.)  Beasley testified that she had known Willy Peters for nine or ten years and she thought of him as a brother. (Tr. III, 150-51.)  Bealsey testified that Peters called her on the evening of January 20 and asked her if she wanted to ride around with him.  (Tr. III, 153.)  Peters picked her up from her house a few minutes later.  (Tr. III, 153.)  There were three other men in Peters' car that Beasley did not know. (Tr. III, 154.)  Beasley identified Averill Williams and Petitioner as two of the men.  Petitioner was introduced to her as "Capone."  (Tr. III, 155-56.)  The third man was introduced as Peters' cousin. Beasley testified that they drove into a beautiful neighborhood and pulled in front of a nice house. (Tr. III, 159.)  Beasley did not see any guns or hear any discussion about a robbery.  (Tr. III, 158-59, 182.)  Peters said that was "his boy's" house and said that "he was going to holler at his boy."  (Tr. III, 160.)  Peters asked Beasley to go knock on the door and see if his boy, Vince, was home.  (*Id.*) Beasley went up on the porch and knocked on the door.  (Tr. III, 161.)  A man came to the door and she asked him if Vince was home.  (*Id.*)  He asked her who she was and shed told him "Angie."  (Tr. III, 162.)  Beasley gave the man a false name because she did not know him. (*Id.*)  The man told her "just minute" and pushed the front door closed most of the way.  (Tr. III, 163.)  The storm door was closed.  (*Id.*)  At that point, Beasley left the porch and went back to the car.  (Tr. III 164.)

Beasley testified that as she got back to the car, all four men got out of the car and ran toward the house.  (Tr. III, 165, 174.)  She could not see the front door from the car, but she assumed that all four men went into the house.  (Tr. III, 174, 184.)  Two or three minutes later, the men came running back to the car one after the other.  (Tr. III, 167.)  The men were acting nervous, but Beasley never saw any masks or guns and did not hear any gun shots.  (Tr. III, 167-68, 173, 186.)  Peters' cousin drove the car away quickly.  (Tr. III, 168.)  Bealsey testified that the men were squabbling, but she did not know what they were talking about.  (Tr. III, 179.)  She asked them what

happened in the house, but they would not answer. (Tr. III, 190.) Beasley told them that she wanted

to go home. (Tr. III, 169.) Beasley denied that she asked the men for their guns or took possession

of the guns. (Tr. III, 169, 183.) Beasley testified that she did not know what they had done until she

saw the news the next day. (Tr. III, 170.) Beasley was upset with Peters for getting her involved

in a crime. (Tr. III, 170-71.)

   Lansing Police Detective Verne Read was one of several detectives assigned to

Denise McCall's murder investigation. (Tr. IV, 14-15.) Due to a lack of leads in the case, the

Lansing Police formed a task force with the Ingham County Sheriff's Department and the Michigan

State Police to investigate the case. (Tr. IV, 24.) After more than a year of investigation, they had

their first break when they spoke with Victoria Beasley on May 30, 1999. (Tr. IV, 26.) The

interview with Beasley led them to interview Willy Peters, who was incarcerated at the time for the

murder of Vincent Burns. (*Id.*) The account Peters gave Read of what occurred at Burns' house on

January 20, 1998, was consistent with Peters' trial testimony. (Tr. IV, 30-38.) Peters told Read that

the gun Petitioner was carrying that night was loaned to him by Williams. (Tr. IV, 65-66.)

   Read first spoke with Petitioner on September 9, 1999. (Tr. IV, 38.) Petitioner

admitted to going to Burns' house on January 20, 1998. He told Read that he got out of the car after

Beasley returned from the knocking on the front door. (Tr. IV, 40.) Petitioner went into the house

a few minutes later armed with a gun, but did not have the gun out. (*Id.*) While he was in the house,

a little dog attacked his pant leg. *Id.* Petitioner told Read that he heard glass breaking as he was

leaving the house and then heard gunshots as he was approaching the car. (Tr. IV, 41.) Petitioner

considered running away on foot, but decided to wait for the car because it was snowing. (*Id.*)

Petitioner did not mention anything about an intended robbery during that statement. (*Id.*) Read

spoke to Petitioner again on March 28, 2000. (Tr. IV, 42.) During the second interview, Petitioner

stated that they went to Burns' house with the intent to commit a robbery.  (Tr. IV, 44-45.)  He

carried a 9-millimeter automatic gun and pulled his hood down around his face so only his eyes were

visible.  (Tr. IV, 44.)  Petitioner also stated that he was not in the car when the girl knocked on the

door, but was hiding behind a car parked in the driveway.  (Tr. IV, 45.)  Petitioner told Read that

he contemplated going down to the basement to seize the money but instead fled when he heard the

glass break.  (*Id.*)  During the second interview, Petitioner stated that "Willy [Peters] had his gun

to the woman's head."  (Tr. IV, 71.)  Petitioned claimed that he kept his gun pointed at the ground

during the entire incident.  (Tr. IV, 72.)  After they all got back in the car, Petitioner asked what

happened, but no one would answer him.  (Tr. IV, 73.)

Read testified that Javell McElwrath agreed to assist the police by engaging Averill

Williams in a conversation while wearing a recording device.  (Tr. IV, 46.)  A tape of McElwrath's

conversation and a transcript of the tapes were admitted into evidence over the objection of defense

counsel.  (Tr. IV, 52-57.)  The prosecution played the tape for the jury and provided each juror with

a copy of the transcript.  (Tr. IV, 58; Transcript of audiotape, docket #38.)  McElwrath and Williams

discussed McCall's murder and whether Willy Peters was providing the police with information, but

Williams denied being involved in the murder and did not make any reference to Petitioner during

the conversation.

Petitioner elected not to testify.  (Tr. IV, 84-85.)  Co-defendant Averill Williams

testified in his own defense at trial.  (Tr. IV, 88.)  Williams denied that he went to Burns' house on

January 20, 1998, or that he had any involvement in the murder of Denise McCall.  (*Id.*)  Williams

testified that he got the information he discussed with McElwrath from other people and the

newspapers.  (Tr. IV, 89.)  Petitioner testified that the word on the street was that he was involved

in the murder, so he went along with McElwrath.  (Tr. IV, 89-90.)  Williams testified that his

- 12 -

friendship with Peters ended in late January 1998, when Peters came home and caught him in bed with Peters' wife.  (Tr. IV, 90.)

At the conclusion of trial, on July 31, 2000, the jury found Petitioner guilty of first-degree felony murder and possession of a firearm during the commission of a felony.  (Tr. V, 27.)

**B.  Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on September 19, 2001, raised the following three claims of error:

I.      ALEXIS SMITH'S CONVICTION FOR FELONY MURDER MUST BE VACATED.  THE STATE PRODUCED INSUFFICIENT EVIDENCE THAT THE CRIME WAS COMMITTED.  IT WAS CLEARLY NOT SHOWN BEYOND A REASONABLE DOUBT THAT MR. SMITH HAD KNOWLEDGE THAT DEATH OR GREAT BODILY HARM WOULD BE THE PROBABLE RESULT OF HIS ACTIONS.  IN FACT, THE RECORD SHOWS THE OPPOSITE, AND AN INJUSTICE HAS OCCURRED.

II.     DEFENDANT-APPELLANT REQUESTS A REMAND FOR AN EVIDENTIARY HEARING ON TRIAL COUNSEL'S EFFECTIVENESS UNDER THE SIXTH AMENDMENT OF THE UNITED STATE CONSTITUTION WHERE: (1) HE DID NOT REQUEST A JURY INSTRUCTION ON THE WITHDRAWAL DEFENSE HE ARGUED TO THE JURY; (2) HE REQUESTED NO CAUTIONARY INSTRUCTION REGARDING CO-CONSPIRATOR'S STATEMENT; (3) HE ALLOWED HIS CLIENT TO TALK TO THE POLICE WHEN THERE WAS NO APPARENT VALUE IN DOING SO; AND (4) HE FAILED TO USE THE ATTACHED CORRESPONDENCE TO IMPEACH WILLY PETERS.

III.    WILLY PETERS WAS AN ACCOMPLICE IN THE CRIME AND WAS A MAJOR WITNESS AGAINST DEFENDANT SMITH.  THE TRIAL JUDGE VIOLATED THE RULES OF EVIDENCE AND DUE PROCESS, AND COMMITTED REVERSIBLE ERROR, WHEN SHE OVERRULED THE DEFENSE OBJECTION TO ADMITTING THE HEARSAY EVIDENCE OF PRIOR CONSISTENT STATEMENTS BY PETERS. THAT HEARSAY BOLSTERED THE PROSECUTION'[S] CASE AND WERE [SIC] MADE WHEN PETERS ALREADY HAD A MOTIVE TO FABRICATE.

(*See* Def.-Appellant's Br. on Appeal, docket #28.)  By unpublished opinion issued on October 11, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 10/11/02 Mich. Ct. App. Opinion ("MCOA Op."), docket #28.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court, raising the following three claims that are similar, but not identical to the claims presented in the Michigan Court of Appeals.  Most notably, Petitioner included only one instance of ineffective assistance of trial counsel.

I.   APPELLANT'S CONVICTION FOR FELONY MURDER MUST BE VACATED.  THE STATE PRODUCED INSUFFICIENT EVIDENCE THAT THE CRIME WAS COMMITTED.  THE MURDER WAS NOT COMMITTED DURING THE COMMISSION OF THE ENUMERATED FELONY.  THAT FELONY (HOME INVASION) WAS OVER, AND APPELLANT WAS FLEEING WHEN THE MURDER OCCURRED.

II.   TRIAL-LEVEL DEFENSE COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT OF THE UNITED STATE CONSTITUTION.  HE DID NOT REQUEST A JURY INSTRUCTION ON THE WITHDRAWAL DEFENSE HE HAD ARGUED TO THE JURY.  MICHIGAN LAW WOULD HAVE ALLOWED IT.  IF THE COURT OF APPEALS IS CORRECT, THAT MICHIGAN LAW WOULD NOT HAVE ALLOWED THE INSTRUCTION, THEN THAT LAW SHOULD BE CHANGED.

III.   WILLY PETERS WAS AN ACCOMPLICE IN THE CRIME AND WAS A MAJOR WITNESS AGAINST DEFENDANT SMITH.  THE TRIAL JUDGE VIOLATED THE RULES OF EVIDENCE AND DUE PROCESS, AND COMMITTED REVERSIBLE ERROR, WHEN SHE OVERRULED THE DEFENSE OBJECTION TO ADMITTING THE HEARSAY EVIDENCE OF PROPER CONSISTENT STATEMENTS BY PETERS. THAT HEARSAY BOLSTERED THE PROSECUTION'[S] CASE.  BUT IT WAS MADE WHEN PETERS ALREADY HAD A MOTIVE TO FABRICATE.

(*See* Def.-Appellant's Br. on Appeal, docket #29.)  By order entered March 31, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 3/31/03 Mich. Ord., docket #29.)

C.     **Post-conviction relief**

Petitioner filed a motion for relief from judgment in the Ingham County Circuit Court on November 17, 2003. The trial court denied his motion on May 16, 2004. Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals asserting the following claims of error:

I.     DEFENDANT'S 6TH AMENDMENT CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN TRIAL COUNSEL (1) FAILED TO OBJECT TO THE TRIAL COURT'S FAILURE TO OBSERVE THE COURT RULE IN JURY SELECTION (2) FAILED TO OBJECT TO AN OUT-OF-COURT STATEMENT WHICH AMOUNTED TO A CONFESSION (3) FAILED TO REQUEST AN INSTRUCTION ON HOME INVASION WHEN THE EVIDENCE CLEARLY SUPPORTS SUCH [AND] (4) FAILED TO OBJECT TO THE ERRONEOUS JURY INSTRUCTION GIVEN BY THE TRIAL COURT.

II.    DEFENDANT'S 5TH AND 14TH AMENDMENT CONSTITUTIONAL RIGHT TO DUE PROCESS AND FAIR TRIAL WAS VIOLATED WHEN THE FIDELITY TO THE COURT RULE WAS NOT OBSERVED IN THE SELECTION OF THE JURORS.

III.   DEFENDANT'S 5TH AND 14TH AMENDMENT CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FAIR TRIAL WAS [SIC] VIOLATED WHEN THE TRIAL COURT: (1) ERRONEOUSLY CHARGED THE JURY (2) GAVE AN ERRONEOUS JURY INSTRUCTION BY OMITTING TWO INTENT ELEMENTS (3) GAVE MISLEADING INSTRUCTIONS THAT PERMITTED THE JURY TO CONVICT THE DEFENDANT ON LESS THAN SUFFICIENT EVIDENCE OF PERSONAL MALICE ON AN AIDING AND ABETTING THEORY [AND] (4) FAILED TO INSTRUCT THE JURY ON AIDING AND ABETTING IN WHICH THE JURY WAS BOND [SIC] OVER ON.

IV.    DEFENDANT'S 14TH AMENDMENT CONSTITUTIONAL RIGHT TO DUE PROCESS WAS VIOLATED WHERE, THE STATE OFFERED MULTIPLE ACTS BY THE SAME DEFENDANT, EACH [OF] WHICH WOVED [SIC] TO SATISFY THE ACTUS REAS ELEMENT OF A SINGLE OFFENSE, AN[D] THE TRIAL COURT FAILED TO INSTRUCT THE JURY THAT IT MUST UNANIMOUSLY AGREE WHICH ACT WAS PROVEN BEYOND A REASONABLE DOUBT TO CONSTITUTE THE CRIME CHARGED.

V.     DEFENDANT'S 6TH AMENDMENT CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED WHEN (1) APPELLATE COUNSEL FAILED TO FILE A MOTION FOR NEW TRIAL BASED ON THE VERDICT BEING AGAINST THE GREAT WEIGHT OF THE EVIDENCE [AND] (2) FAILED TO PROPERLY RAISE AND INVESTIGATE THE ISSUE OF TRIAL COUNSEL'S FAILURE TO IMPEACH STATES KEY WITNESS WITH STATEMENT THAT POSSESSED EXCULPATORY VALUE.

VI.     THE CUMULATIVE EFFECTS OF INEFFECTIVE ASSISTANCE OF COUNSEL AT BOTH TRIAL LEVEL AND APPEAL, AS WELL AS THE ABUSE OF DISCRETION DENIED DEFENDANT'S 5TH AND 14TH AMENDMENT CONSTITUTIONAL RIGHT TO DUE PROCESS AND FAIR TRIAL.

(*See* Def.-Appellant's Br. on Appeal, docket #30.)  On December 16, 2004, the Michigan Court of Appeals denied Petitioner's delayed application because he failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (*See* 12/16/04 Mich. Ct. App. Ord., docket #30.) The court of appeals denied Petitioner's motion for reconsideration on February 4, 2005.  (*See* 2/4/05 Mich. Ct. App. Ord., docket #30.)  Petitioner raised the same six claims in his application for leave to appeal in the Michigan Supreme Court.  By order dated May 31, 2005, the supreme court denied Petitioner's application for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (*See* 5/31/05 Mich. Ord., docket #31.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

- 16 -

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).       A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

- 17 -

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A.      Procedural Default

All of Petitioner's grounds for habeas corpus relief were raised for the first time in his motion for relief from judgment.  Because review of his motion was denied by the Michigan appellate courts pursuant to MICH. CT. R. 6.508(D), his claim is procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the

petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. 536-37. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals and the Michigan Supreme Court expressly denied Petitioner's applications for leave to appeal on the basis that Petitioner failed to "meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)." Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably

likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).

A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).  In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence.  *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000).  Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See  Luberda*, 211 F.3d at 1007; *Rogers*, 144 F.3d at 994.  Therefore, Petitioner's claim is procedurally defaulted unless he can show cause and prejudice or make a colorable claim of actual innocence.  *See House*, 547 U.S. 536-37.

The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume

without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

### B.    Jury Instructions

Five of Petitioner's habeas claims concern alleged instructional errors by the trial court.  Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.* As set forth below, Petitioner cannot show that the jury instructions violated his due process rights.

1.    In his first ground for habeas relief, Petitioner claims that he was deprived of his Fifth and Fourteenth Amendment rights of due process and his Sixth Amendment right to effective assistance of counsel when counsel failed to object to erroneous jury instructions. During voir dire, the trial court asked potential jurors:

> How many of you have heard of the term felony murder?  If you have, please raise your hand.  Just about everyone except Ms. Cheiesa.  Does anyone think that you can tell me what it means, felony murder?  And I won't pick on one of you out of the blue, but if there's anyone who thinks that you could tell me what it means, please raise your hand.  No volunteers.  How many of you believe that felony murder requires that a person have an intent to kill another person while committing a felony? If you think that's what felony-murder is, please raise your hand? and about half the jury believes that. *Could you follow a law that says a person can be found guilty of felony murder even if that person had no desire that another person be killed?*  Is that a confusing question for you?

(Tr I., 27.)  Petitioner's counsel argues that the court's comments permitted the jury to convict Petitioner of murder without finding an intent to kill, which he claims is required by Michigan law.

As an initial matter, the trial court was not instructing the jury on the law at that stage of the proceedings.  Rather, the trial court was performing voir dire to determine whether potential jurors could apply the felony-murder statute.  The elements of felony murder are: (1) the killing of a human being; (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result; (3) while committing, attempting to commit, or assisting in the commission of an enumerated offense, including robbery.  *See People v. Smith*, 733 N.W.2d 351, 365 (Mich. 2007).  The second element provides three alternative states of mind that can satisfy the malice requirement for felony murder.  In addition to an intent to kill, the malice requirement is satisfied if the jury finds that the defendant intended to inflict great bodily harm or intended to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result.  The malice necessary for a felony-murder conviction cannot be inferred from the intent to commit the underlying felony alone; however, the jury may infer a malicious intent from the facts and circumstances of the underlying felony.  *People v. Dumas*, 563 N.W.2d 31, 35 (Mich. 1997).

While he does not raise a sufficiency of the evidence claim in his habeas petition, Petitioner claimed in his direct appeal that there was insufficient evidence to convict him of first-degree felony murder.  Specifically, he argued on appeal that the prosecution failed to prove beyond a reasonable doubt that he knew that death or great bodily harm would be the probably result of his actions.  In rejecting Petitioner's claim, the Court of Appeals stated:

> By engaging in the robbery defendant set in motion a force likely to cause death or great  bodily harm.  Defendant knowingly participated in the crime, armed with a

gun.  Even if defendant did not fire the fatal shot, sufficient evidence was produced to infer he acted with malice by participating in a robbery involving the use of guns, acting in wanton and willful disregard of the possibility that death or great bodily harm would result.

(MCOA Op. 4.)  Thus, the court of appeals found sufficient evidence to satisfy the malice requirement for felony-murder.  The court of appeals did not find evidence of intent to kill; rather, the court relied upon the third alternative state of mind, i.e., that Petitioner created a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result.  The trial court's final instructions properly defined the elements of felony murder, including the malice requirement.  (Tr. V, 17.)  Because an "intent to kill" is not required for a felony-murder conviction, the trial court's inquiry during voir dire was not improper.

Petitioner also claims that defense counsel was ineffective for failing to object to the trial court's comments.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of

professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

I concluded above that the trial court's inquiry was not improper and that counsel's failure to make an unnecessary objection did not fall below an objective standard of reasonable performance.  *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004) ("Counsel is not required to argue a frivolous or meritless motion."); *Ashe v. Jones*, No. 98-1324, 2000 WL 263342, at *4 (6th Cir. Feb. 29, 2000) (counsel was not required to make a meritless objection to evidence that was admissible under Michigan law).  Petitioner, therefore, cannot satisfy the first *Strickland* requirement.  Where, as here, counsel's performance did not fall below an objective standard of reasonableness, the Court need not reach the question of prejudice.  *See Strickland*, 466 U.S. at 697; *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004); *Smith v. Mitchell*, 348 F.3d 177, 199-200 (6th Cir. 2003).  Accordingly, Petitioner fails to raise a meritorious Sixth Amendment claim.

2.     In his second ground for habeas corpus relief, Petitioner claims that the trial court erred by not fully charging that aiding and abetting required an intent to kill.  With regard to co-defendant Averill Williams, the trial instructed the jury on the alternative theories of first-degree premeditated murder and first-degree felony murder.  With regard to Petitioner, the trial court instructed the jury on the alternative theories of first-degree felony murder and second-degree murder.  The court gave the following felony murder instruction for co-defendant Williams:

> The Defendant, Averell Williams, is also charged in Count I with first-degree felony murder.  To prove this charge the Prosecutor must prove each of the following

elements beyond a reasonable doubt.  First, that Defendant Averell Williams, caused the death of Denise McCall; that is, that Ms. McCall died as the result of a gunshot wound.  Second, that Defendant Averelll Williams, had one of these three states of mind.  *He intended to kill or he intended to do great bodily harm to Denise McCall or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions*.  Third, that when Defendant, Averell Williams, did the act that caused the death of Denise McCall, Defendant Averell Williams, was committing the crime of home invasion first-degree.

(Tr. V, 16) (emphasis added.)  With regard to Petitioner, the trial court gave the following felony murder instruction:

The Defendant, Alexis Smith, is charged in Count I with first-degree felony murder. To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt.  First, that his Co-Defendant Averell Williams, caused the death of Denise McCall; that is, that Ms. McCall died as the result of a gunshot wound.  Second, that Defendant, Alexis Smith, *knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions*.  Third, that when Co-Defendant, Averell Williams, did the act that caused the death of Denise McCall, Defendant, Alexis Smith, was committing the crime of home invasion first-degree.

(Tr. V, 17) (emphasis added).  There was no objection to these or to any of the court's instructions at trial, by any of the parties.  (Tr. V, 19.)

Counsel argues that in instructing the jury as to Petitioner, the trial court omitted the phrase "He intended to kill," which violated Petitioner's due process right that the jury be instructed as to all of the elements of the offense.  As discussed above, three alternative states of mind that can satisfy the malice requirement for felony-murder:  (1) intent to kill, (2) intent to do great bodily harm or (3) intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result.  *See Smith*, 733 N.W.2d at 365.  In light of the evidence in this case, it was clear that Co-Defendant Williams was the shooter and that Petitioner ran out of the house moments before McCall was shot.  Consequently, in giving the felony murder

- 25 -

instruction for Petitioner, the trial court relied upon the third possible mental state.  So long as the jury found that Petitioner intended to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result, the malice element for felony-murder was satisfied.  Accordingly, the trial court's instruction on felony-murder did not violate Petitioner's due process rights.

Counsel also maintains that the trial court was required to fully instruct the jury on the elements of aiding and abetting with regard to Petitioner.  However, Petitioner was not charged or convicted of first-degree murder under an aiding and abetting theory.  Rather, he was charged and convicted of first-degree felony murder.  Accordingly, the trial court was not required to instruct the jury on aiding and abetting.

3.      Petitioner claims in Ground III that the trial judge erred by shifting the burden of proof when she made the following statements to the jury:

> Is there anyone who would rather let a guilty person go free than give another criminal a break in order to get him to testify?  And again, there's no right or wrong answer to these questions, but we do need to know what you believe. . . .

> Would anyone prefer this kind of arrangement not be made even if meant that a guilty person could never be charged because there was no one to testify against him?  Is there anyone who would still prefer that that kind of arrangement not be made?  If that is your preference, please raise your hand.  No hands are raised.

(Tr. I, 29.)  Petitioner's argument is difficult to follow, but he appears to assert that the trial court's questions shifted or lessened the prosecutor's burden of proof because they implied that Petitioner had some obligation to present a defense at trial.  I disagree.  The complained of inquiry was made by the trial court during voir dire, not during the trial court's final instructions on the law.  The trial court's inquiry concerned the prosecutor's main witness, Willy Peters, a co-perpetrator of the offense, who testified for the prosecution in exchange for a guilty plea.   To the extent that the trial

court's inquiry may have implied that Petitioner or Averill Williams was a "guilty person," it did not rise to the level of a due process violation.  The trial court's inquiry was relatively brief and occurred on the first day of the proceedings.  During the final instructions, the trial court instructed the jury that a defendant is presumed innocent until proven guilty beyond a reasonable doubt.  (Tr. V, 4.)

        4.      In his fourth ground for habeas relief, Petitioner contends that the trial court erred by failing to instruct the jurors that their verdict must be unanimous with regard to each offense.  Petitioner concedes that the trial court gave the standard jury instruction on unanimity, but claims that the trial court failed to give, *sua sponte*, a special instruction that the jury's verdict had to be unanimous as to each charge against each of the Defendants.

        The trial court gave the following instructions concerning unanimity:

> You have been instructed on the two types of first-degree murder as to Defendant Averell Williams.  Those two types are pre-meditated murder and felony murder. A verdict in a criminal case must be unanimous.  To be unanimous each of you must agree upon which type of first-degree murder has been proved or that both types of first-degree murder have been proved.  If you return a verdict of guilty of first-degree murder as to Averell Williams, your unanimous verdict must specify whether all of you have found the Defendant guilty of: (A) Pre-mediated murder or (B) Felony murder or (C) Both.

>        \*\*\*

> For Count I you may also consider the lesser charge of second-degree murder for Alexis Smith . . . .  If you find Defendant [Smith] guilty of murder you must state in your verdict whether it is murder in the first-degree or murder in the second-degree.

>        \*\*\*

> A verdict in a criminal case must be unanimous.  In order to return a verdict it is necessary that each of you agrees on that verdict.  In the jury room you will discuss the case among yourselves, but ultimately each of you will have to make up your own mind.  Any verdict must represent the individual considered judgment of each juror.

- 27 -

(Tr. V, 18-21.)

The Sixth Amendment to the United States Constitution requires a unanimous verdict to convict the defendant in a criminal trial. *United States v. Smedes*, 760 F.2d 109, 112 (6th Cir. 1985). As set forth above, the trial court instructed the jury on unanimity. There was no objection to these instructions at trial, nor did Petitioner request a special instruction on unanimity. He cannot show that the trial court's failure to give a special instruction resulted in a denial of fundamental fairness.

5.      In Ground V, Petitioner claims that the trial court erred by not *sua sponte* instructing the jury on the affirmative defense of abandonment. Counsel contends that the defense was supported by the uncontroverted evidence that Petitioner left the house before the shooting occurred. Petitioner raised a related claim in his direct appeal, when he claimed that his trial counsel was ineffective for failing to request an instruction on abandonment. While Petitioner does not present the claim of ineffective assistance of counsel in his habeas petition, the Michigan Court of Appeals' decision on that issue is instructive on the issue of abandonment. The court of appeals stated:

> Defendant argues that counsel was ineffective for failing to request a jury instruction regarding the defense of abandonment. A court is required to instruct a jury with instructions pertaining to any theories or defenses that are supported by the evidence. *People v Lemons*, 454 Mich 234, 250; 562 NW2d 447 (1997). Abandonment is an affirmative defense, and a defendant bears the burden of establishing by a preponderance of the evidence voluntary and complete abandonment of the criminal purpose. *People v Cross*, 187 Mich App 204, 206; 466 NW2d 368 (1991). Abandonment is voluntary when it is the result of repentance or a genuine change of heart. *Id*. Abandonment is not available when a defendant fails to complete the attempted crime because of unanticipated difficulties, unexpected resistance, or circumstances that increase the probability of detection or apprehension. *Id*., quoting *People v Kimball*, 109 Mich App 273, 286; 311 NW2d 343, mod on other grounds 412 Mich 890, 891 (1981). Assuming arguendo that defendant could have raised the abandonment defense, no evidence in the record

- 28 -

> supported the defense. Although defendant left the house before the shooting occurred, there was no evidence that he voluntarily withdrew from the crime because of a change of heart. Therefore, counsel was not ineffective for failing to request an abandonment instruction.

(MCOA Op. 1-2.)  As discussed by the court of appeals, the evidence did not support an instruction on abandonment because there was no evidence that Petitioner left the house because of a genuine change of heart.  The evidence showed that Petitioner ran out of the house after he and Williams heard glass breaking in the basement and Williams told Petitioner to go after Vincent, who had escaped through a basement window.  (Tr. III, 77-78; Tr. IV, 41, 45.)  In light of the evidence, Petitioner was not denied a fundamentally fair trial as a result of court's failure to instruct the jury *sua sponte* on the defense of abandonment.

### C.      Ineffective Assistance of Appellate Counsel

Petitioner asserts that his appellate counsel was ineffective for failing to file a motion for a new trial on the following grounds that: "(A) The People failed in their proof of felony murder by not demonstrating that Defendant was the victim of unanticipated consequences of acts of his co-Defendants and (B) Trial counsel failed to produce the Peters['] letter and to actively address this crucial issue."  (Petitioner's Br. in Support, 23, docket #2.)

With regard to Part (A), Petitioner essentially argues that there was insufficient evidence to support his conviction for first-degree felony murder.  Appellate counsel raised the issue of insufficient evidence in Petitioner's direct appeal.  As discussed above, the claim was rejected by the Michigan Court of Appeals.  Because appellate counsel properly raised the claim on direct appeal, counsel's failure to raise the claim in a motion for new trial did not fall below an objective standard of reasonableness.

Petitioner also claims that appellate counsel was ineffective for failing to move for a new trial on the ground that "trial counsel failed to produce the Peters letter and to actively address this crucial issue."   Petitioner alleges that in response to a discovery request, the prosecution provided defense counsel with a letter from co-defendant Willy Peters to the trial court dated February 3, 1999.  (Petitioner's Br. in Support, Appendix C, docket #2.)  Peters' letter stated in part:

> I held my silence too long but I didn't know that this same guy did it because a lot of different people got arrested.  I didn't know he did it until the end of February 1998 when them two came over to a relative of mine [sic] house.  I guess he seen my car and came over there and that's when he told me how and why he shot Vincent's mother.

(Pet'r's Br. in Supp., App. C, 5-6).  Petitioner claims that the letter conflicted with Peters' trial testimony to the extent it suggests that he was not directly involved in the robbery that resulted in McCall's death and did not learn about her death until February 1998.  Consequently, Petitioner argues that his trial counsel should have used the letter to impeach Peters' trial testimony.

Petitioner did not raise this claim of ineffective assistance of appellate counsel in his direct appeal; however, at Petitioner's request, his appellate counsel raised a claim that trial counsel was ineffective for failing to use Peters' letter to the trial court to impeach his trial testimony. Petitioner raised four claims of ineffective assistance of counsel in the Michigan Court of Appeals. The claim concerning Peters' letter was sub-issue four.  In his brief before the Michigan Court of Appeals, appellate counsel stated:

> The sub-issues one through three were presented to this Court in the context of a Motion to Remand, denied on June 7, 2001.  This sub-issue, that is, the attached letter, was not brought to [appellate] counsel's attention until after June 7, 2001.  It is arguably not properly before this Court.  But rather than generate concern or disgruntlement from Mr. Smith, the undersigned presents it.  Presumably, this Court will reverse on one of the many other meritorious issues.  Otherwise, Mr. Smith's argument regarding this letter is that, in it, Peters appears to write that he learned

about the McCall homicide after it occurred.  Whereas at trial, he testified that he was present.  Or at least, present just before the homicide occurred.

(Br. of Defendant-Appellant, 20, docket #28.)  The Michigan Court of Appeals declined to address

the issue, stating:

> We decline to address defendant's final argument regarding a letter allegedly written by a testifying witness indicating he may not have had first-hand knowledge of the murder because this letter is not part of the lower court record.  MCR 7.210(A)(1); *People v. Shively*, 230 Mich App 626, 628 n 1; 584 NW2d 740 (1998).  Moreover, defendant has produced no evidence that defense counsel had access to the letter or even knew of its existence.

(MCOA Op. 2.)

Petitioner's counsel contends that appellate counsel raised the issue in a manner that constituted "a cynical brush off to his client rather than an appellate argument."  (Pet'r's Br. in Supp., 30.)  While appellate counsel may not have viewed the claim as meritorious, he followed his client's wishes and presented the claim in the Michigan Court of Appeals.  Because appellate counsel raised  the issue on appeal, his failure to raise the issue in a motion for a new trial did not render his performance constitutionally deficient.  Moreover, assuming trial counsel was aware of the letter before trial, its impeachment value was minimal.  Peters' seven-page letter is rambling, vague and difficult to follow.  The letter does not provide any specific details concerning McCall's death and does not identify by name the individual(s) responsible for her death. By contrast, the testimony Peters gave in court was under oath, and after Peters had already received his sentence.

### D.    Cumulative Error

Petitioner claims that he was deprived of his Fifth and Fourteenth Amendment due process rights as a result of the cumulative effect of the above errors.  Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law.  *Bailey*, 271 F.3d at 655.  The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on

habeas review.  "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Because I find that Petitioner's previous claims are without merit, Petitioner cannot show that the cumulative effect of the errors violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  August 7, 2008                          /s/ Hugh W. Brenneman, Jr.
                                                HUGH W. BRENNEMAN, JR.
                                                United States Magistrate Judge



### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).